**MARASTRO COMPANIA NAVIERA, S.A., Plaintiff–Appellee–Cross–Appellant,**

v.

**CANADIAN MARITIME CARRIERS, LTD., Intervenor–Plaintiff–Appellant–Cross–Appellee,**

v.

**The FOOD CORPORATION OF INDIA, Defendant–Cross–Appellee,**

**and**

**National Agricultural Cooperative Marketing Federation of India, Ltd., Movant–Appellant–Cross–Appellee.**

**CANADIAN MARITIME CARRIERS, LTD., Plaintiff–Appellant,**

v.

**MARASTRO COMPANIA NAVIERA, S.A., Defendant–Appellee.**

No. 91–3141.

United States Court of Appeals, Fifth Circuit.

April 28, 1992.

Rehearing and Rehearing En Banc Denied June 10, 1992.*

* See 963 F.2d 754.

Christopher O. Davis, Sheryl Bey, Phelps Dunbar, New Orleans, La., for National Agr.

Campbell E. Wallace, Hoffman, Sutterfield, Ensenat & Bankston, New Orleans, La., for Canadian Maritime.

Ashton R. O'Dwyer, Jr., J. Dwight Le-Blanc, III, Lemle & Kelleher, New Orleans, La., for Marastro Compania Naviera, S.A.

Before REYNALDO G. GARZA, and GARWOOD, Circuit Judges, and SCOTT, District Judge.**

NAUMAN S. SCOTT, District Judge:

This matter arises from the seizure of a cargo of corn aboard a vessel on the Mississippi River, in the Eastern District of Louisiana. Marastro Compania Naviera, S.A. ("Marastro"), a Panamanian corporation, was the judgment creditor in a judgment against Food Corporation of India ("FCI"), an agency independent of the Government of India ("GOI"), which judgment was ultimately made executory in the United States District Court for the Eastern District of Louisiana. Believing that National Agricultural Cooperative Marketing Federation of India Limited ("NAFED") and FCI were alter egos of the GOI, Marastro seized a shipment of corn allegedly belonging to NAFED which was loaded aboard the M/V DERBY NORTH, a vessel chartered to Canadian Maritime Carriers, Ltd. ("Canadian"), a foreign corporation. The vessel was docked at Cargill Elevator on the Mississippi River in Reserve, Louisiana. Subsequent to the seizure, Canadian filed a suit against Marastro and also intervened

** Senior District Judge of the Western District of Louisiana, sitting by designation.

(which was allowed) in the seizure suit. The suits were consolidated for trial.

Trial of the matter was held on May 23, 1990. The trial court found, in essence, that NAFED was independent of the GOI, that NAFED's assets and liabilities, including the seized cargo, were distinct from those of the GOI, and that Marastro's seizure was improper. It also held that because jurisdiction of the seizure was under general maritime law and because Marastro acted in good faith, Marastro was not liable for damages to either NAFED or Canadian.

## FACTS

1. In 1989, the United States donated 200,000 metric tons of corn for animal and poultry consumption to the farmers of India pursuant to a United States Government Agricultural Commodity Foreign Agreement, Section 416(b) ("the 416(b) Agreement"). NAFED was designated to act as Cooperating Sponsor for the purposes of the 416(b) Agreement and the designation was approved by the United States government. NAFED's obligations under the 416(b) Agreement included procuring, distributing, and disposing of the corn.

2. Canadian was the owner *pro hac vice* of the M/V DERBY NORTH, pursuant to a charter which obligated NAFED to pay $11,975.00 per day for the use of the vessel in addition to bunker fuel and other usual operating expenses while it was under charter. In return for payment of hire, Canadian obtained the exclusive right to possession and use of the M/V DERBY NORTH for the term of the charter. On the evening of July 12, 1989, the M/V DERBY NORTH arrived at Cargill Elevator on the Mississippi in Reserve, Louisiana, to load a cargo of corn it had contracted to carry. Loading began at 3:10 a.m. on July 13, 1989 and continued until completed at 6:00 a.m. on July 15, 1989. Under the 416(b) Agreement, once the corn was loaded, it became the property of the designated Cooperative Sponsor, NAFED.

3. Marastro, believing that NAFED and FCI were simply alter egos of the GOI, that the GOI was the true owner of the corn, and that the corn could be seized to satisfy Marastro's judgment against FCI, filed suit against NAFED alleging jurisdiction under 28 U.S.C. §§ 1330 and 1331, and caused the United States Marshal to serve of writ of execution and *fieri facias* upon the cargo of corn. The seizure was made at midnight on July 14, 1989.

4. The M/V DERBY NORTH was fully loaded at the Cargill Elevator at 8:00 a.m. on July 15, 1989 and the vessel was in all respects ready to sail directly to its discharge port in Pondicherry, India. Because of Marastro's seizure, the vessel could not leave port, but instead remained idle. After the filing of bonds by Marastro and NAFED, the trial court ordered the corn released from seizure and on July 24, 1989 the M/V DERBY NORTH immediately set sail for India.

5. Based on the following factual evidence, the trial court found correctly that NAFED was an entity totally independent of the GOI and FCI:

a. The GOI, at the time of the seizure, contributed only 15% to NAFED's capital and that was being reduced to nothing;

b. None of NAFED's employees were employees of the GOI;

c. Although the GOI officials were involved in the negotiation of the 416(b) Agreement at issue, NAFED was the Cooperating Sponsor and was identified as such in Attachment A, Plan of Operation. The 416(b) Agreement was executed by duly authorized agents of NAFED, not by the GOI;

d. The GOI does not have effective or absolute control of NAFED. In fact, it has only one vote in a membership of almost 300;

e. NAFED is viewed as a separate entity by third parties, including the United States Agency for International Development Corporation as evidenced in its correspondence requesting the semi-annual report;

f. There is no evidence that the GOI was involved in the day to day activities of

NAFED, which generates its own income, obtains commercial loans, and owns property.

6. At the time of the seizure, the M/V DERBY NORTH became the warehouse custodian of the seized corn until July 24, 1989 when the seizure was released. During that time Canadian had to pay $114,700.00 for the ten (10) days of charter hire, $3,500.00 bunker fuel, $1,480.25 pilotage from load berth to anchorage, $1,480.00 launch service while at anchorage, $2,200.00 agency fees while detained, for a total of $123,360.25, for which it has not yet been paid.

## CONCLUSIONS

■ 1. There have been repeated allegations that the court in this proceeding had jurisdiction under 28 U.S.C. § 1330 as modified by the Foreign Sovereign Immunities Act ("FSIA") 28 U.S.C. § 1602.

**§ 1330. Actions against foreign states**

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action *against a foreign state as defined in section 1603(a) of this title* [28 USCS § 1603(a)] as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title [28 USCS §§ 1605–1607] or under any applicable international agreement. (emphasis ours)

The only defendant over whom the court is given jurisdiction is "a foreign state as defined in § 1603(a) of this title". Such "foreign state" is defined as:

**§ 1603. Definitions**

For purposes of this chapter [28 USCS §§ 1602 *et seq.*]—

(a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise and

(2) *which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof,* and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title nor created under the laws of any third country. (emphasis ours)

2. If, indeed, Marastro believed that NAFED and FCI were agents and/or alter egos of the GOI so that the GOI was actually the true owner of the corn loaded on the M/V DERBY NORTH, then it was Marastro's burden to prove it. It has failed to do so. We affirm the trial court's conclusion that, as a matter of law, NAFED was and is an entity totally and completely independent of the GOI and FCI. *Hester International Corp. v. Federal Republic of Nigeria,* 879 F.2d 170 (5th Cir.1989). Consequently we do not have jurisdiction under 28 U.S.C. § 1330 and/or 28 U.S.C. §§ 1602 *et seq.* and the formal requirements for seizure under the latter do not apply.

■ 3. The corn when seized by Marastro was located in the hold of a M/V DERBY NORTH which was afloat in navigable waters and was about to depart in international commerce from the Cargill Elevator on the Mississippi River in Reserve, Louisiana for Pondicherry, India. We agree with the trial court that we have admiralty jurisdiction and that the general maritime law applies. *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) and *Foremost Insurance Company v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982). This cargo seizure was sufficiently connected to traditional maritime activity to invoke the maritime jurisdiction of the district court. *Molett v. Penrod Drilling Co.,* 826 F.2d 1419 (5th Cir.1987).

■ 4. We found previously that NAFED was an entity completely independent of FCI and the GOI; that the United

States had donated corn to the farmers of India pursuant to the 416(b) Agreement; that NAFED had been designated by the GOI to act as Cooperating Sponsor for the purposes of the 416(b) Agreement and that under the terms of the agreement, NAFED became the owner of the corn when it was loaded on the M/V DERBY NORTH. We agree with the district court that the seizure was illegal because it was made pursuant to Marastro's judgment against FCI not NAFED and because NAFED, not FCI, was owner of the corn.

 5. The claims for wrongful seizure and Canadian's claim for trespass against Marastro are substantive in nature, not procedural. Since we have found the FSIA to be inapplicable to this case, there is no need to analyze the substantive law of the seizure from that prospective. Maritime law controls the substantive law of maritime seizures and requires that damages be awarded only on a showing of "bad faith, malice, or gross negligence." It also establishes that "advice of competent counsel, honestly sought and acted upon in good faith is alone a complete defense to an action for malicious prosecution." *Frontera Fruit Co. v. Dowling*, 91 F.2d 293, 297 (5th Cir.1937). The trial transcript of the testimony of Alexis Nichols, acting as agent for Marastro in the seizure, reflects that his decision was predicated on just such advice. We affirm the trial court's conclusion that Marastro acted in good faith and did not show a wanton disregard for the rights of NAFED or Canadian and that neither NAFED nor Canadian is entitled to damages for wrongful seizure.

 6. We agree with the trial court that Canadian does not have a cause of action against Marastro for trespass. While no rule of trespass exists in maritime law, federal courts may borrow from a variety of sources in establishing common law admiralty rules to govern maritime liability where deemed appropriate. *Conner v. Aerovox, Inc.*, 730 F.2d 835 (1st Cir. 1984), *cert. denied* 470 U.S. 1050, 105 S.Ct. 1747, 84 L.Ed.2d 812 (1985). It has held that in the absence of federal cases or an established federal admiralty rule on trespass, it would be more appropriate to apply general common law rather than state law which would "impair the uniformity and simplicity which is a basic principle of the federal admiralty law ..." *Nissan Motor Corp. v. Maryland Shipbuilding, etc.*, 544 F.Supp. 1104, 1111 (D.Md.1982), citing *Byrd v. Byrd*, 657 F.2d 615 (4th Cir.1981). Applying this rationale, we hold that general common law and in particular the Restatement (Second) of Torts should control to determine the law of maritime trespass, in order to promote uniformity in general maritime law. 544 F.Supp. at 1111.

Under the Restatement, one is liable for trespass if he intentionally enters land in possession of another, or causes a thing or a third person to do so. Restatement (Second) of Torts § 158. However, the Restatement also contains a privilege for entry pursuant to an Order of Court. Restatement (Second) of Torts § 210. We therefore hold that Canadian's claim of trespass falls under this privilege and is without merit.

 7. But Canadian did have the misfortune of its vessel being forced to store and safeguard the cargo under seizure. It was in no different position than a warehouse or grain elevator which contains seized property and is forced to hold that property under court order. Storage expenses for property under seizure are specifically covered under 28 U.S.C. § 1921(a)(1)(E); the statute requires such fees to be collected and taxed as costs. The undisputed evidence submitted by Canadian indicates that its costs during the seizure, for which it has not yet been compensated, are as follows: charter hire, $114,700.00 (10 days); bunker fuel, $3,500.00; pilotage from load berth to anchorage, $1,480.25; launch service while at anchorage, $1,480.00; agency fees while detained, $2,200.00, for a total of $123,-360.25. While we recognize that this is an expensive warehouse, no off loading facilities were available in the area. It would be patently unfair to expect Canadian, an innocent third party in this dispute, to absorb these costs. We therefore hold that Marastro is liable to Canadian in the amount of

$123,360.25 for storage fees of cargo under seizure.

We hold that the trial court properly vacated Marastro's seizure of the cargo of corn, based on the fact that NAFED, the owner of the cargo, was not the judgment debtor of the judgment in execution. We also affirm the trial court's dismissal of the tort claims against Marastro by NAFED and Canadian. We further hold that Marastro is liable to Canadian for $123,360.25 as costs for storage of property under seizure.

The order of the trial court is

AFFIRMED in part and REVERSED in part.